# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| OSR Enterprises AG and OSR R&D ISRAEL LTD., | |
| *Plaintiffs*, | Civil Action No. 1:22-cv-01327 |
| -against- | |
| REE Automotive Ltd., REE Automotive Holding, Inc. and REE Automotive USA Inc., | |
| *Defendants*. | |

## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR FORUM NON CONVENIENS, LACK OF PERSONAL JURISDICTION, AND <u>STATUTES OF LIMITATIONS</u>

Defendants REE Automotive Ltd., REE Automotive Holding, Inc., and REE Automotive USA Inc. (collectively, "Defendants" or "REE Entities") hereby move to dismiss Plaintiffs' Complaint for forum non conveniens, lack of personal jurisdiction, and being barred by the applicable statutes of limitations. In support of their Motion, Defendants provide the following:

## I.   INTRODUCTION

By choosing to amend their complaint rather than respond to REE's motion to dismiss, Plaintiffs all but concede that their initial complaint had significant problems—ones they could not risk allowing this Court to rule on, at least not before having one more try at repackaging their story. Yet, for the reasons covered below, Plaintiff's amended complaint fares no better. Plaintiffs' band-aid revisions do little to address what were (and *still* are) dispositive considerations that warrant dismissal.

To be sure, this dispute remains about events that allegedly happened in ***Israel***, involved ***Israelis***, and that will, ultimately, be governed by ***Israeli*** law. No number of amendments can change those facts, or that governing precedent and practical sense all lead to one conclusion: this case should be adjudicated ***in Israel***.

Indeed, Plaintiffs—an Israeli R&D firm and its Swiss-based parent—accuse Defendants— two Israeli companies and a downstream-U.S. subsidiary—of having hired nine former employees who they allege brought with them certain documents, knowledge, and expertise that Plaintiffs maintain amount to "trade secrets." Defendants vigorously dispute the merits of that claim, which this Court can address should it keep this action before it. But, key to *this* Motion is that every former employee that Plaintiffs named in their Complaint worked at OSR R&D Israel Ltd.—***in Israel***. And each one later joined REE Automotive—***in Israel***. In fact, nearly all of Plaintiffs' allegations about *who*, *when,* and *where* they developed their "trade secrets," and *who*, *when* and

*where* they were (allegedly) misappropriated, too, center on people and events *in Israel*. Plaintiffs even allege that, before they filed their Complaint, the "Sergeant Major of the *Israeli police* confirmed to OSR that there is an investigation 'currently being conducted' by a special team of the *Israeli police's cybercrime division*, together with the head of the division and the guidance *of* an *Israeli district attorney's office.*" That investigation and any potential action taken from it would, of course, all occur *in Israel.*

Thus, Plaintiffs' own allegations make plain that this is a foreign dispute that has no place in this Court. That is particularly so given that, to adjudicate this matter, this Court will have to make several decisions based on Israeli law—including whether the information that OSR alleges was taken qualifies as a trade secret at all. Plus, if litigated here, enormous resources will be spent collecting, hosting, translating, and *then* interpreting an untold amount of documents written mainly in Hebrew. And that is to say nothing about the burden that would be imposed on witnesses for both sides—as well as third parties—who will have to fly back and forth across the Atlantic Ocean and Mediterranean Sea to meaningfully participate in these proceedings. Though, most taxing of all is the cost this Court and a local jury will bear in having to adjudicate this largely foreign dispute.

None of these burdens need be imposed to resolve this matter. An Israeli court would provide a far more appropriate forum, particularly because it would allow the parties to litigate where they both call *home*. The Court should thus dismiss this action for forum non conveniens.

At a bare minimum, this Court should dismiss Defendants REE Automotive and REE Holding (the "Israeli Defendants") for lack of personal jurisdiction. In seeking jurisdiction over them, Plaintiffs mostly point to actions taken by a U.S. subsidiary, REE USA, instead of those taken directly by the Israeli Defendants. That is insufficient as a matter of settled law. Controlling

precedent makes clear that, "[t]o 'fuse' the parent company and its subsidiary for jurisdictional purposes, . . . the evidence must show that the [parent and subsidiary] entities cease to be separate so that the corporate fiction should be disregarded to prevent *fraud* or *injustice*." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002) (emphasis added and internal citations omitted). Plaintiffs have not made that showing here. The Israeli Defendants should thus be dismissed for lack of personal jurisdiction.

All told, Plaintiffs filed a lawsuit more than 7,100 miles and several continents away from where *they* alleged the core wrongdoing occurred: ***Israel***. That is classic forum-shopping—which alone warrants dismissal for forum-non-conveniens. *See Piper Aircraft v. Reyno*, 454 U.S. 235, 249 n.15 (1981) ("[D]ismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to . . . take advantage of favorable law."). So do all of the other relevant considerations courts look to in weighing whether to dismiss in favor of an alternative forum, such as the adequacy of the forum and "public"- and "private"- interest factors.

With all that said, even if this Court were to exercise jurisdiction and retain forum, the Court should still dismiss this case as time-barred. Here, both the original and amended complaints provide a clear chronology: (i) Plaintiffs allege that in September 2019 they lent their then-head of R&D, Ohad Stauber, a designated laptop that housed their "trade secrets"—including "source code"—while he attended a trade show in Germany; (ii) Plaintiffs further allege that, while there, Stauber transferred OSR's "trade secrets" from a company-designated laptop to his personal, work-assigned laptop (the "Stauber Laptop") using external hard-drives he brought with him to the trade show; (iii) Plaintiffs then allege that, in early November 2019, Stauber gave notice he would be leaving OSR to join REE; finally (iv) Plaintiffs allege that, at some point after giving notice but before leaving, Stauber refused to turn in the hard-drives that housed OSR's "source

code" and returned his laptop (the Stauber Laptop) with "gigabytes" of data containing OSR's "proprietary work" scrubbed altogether. And so, given Plaintiffs further confirm Stauber's last day at OSR was on *November 25, 2019*, the limitations period for all of their claims began accruing by no later than *that point*. As a result, Plaintiffs had—at most—two years from then to file their unfair-competition claim and three years to file their trade-secret and conspiracy claims. Plaintiffs failed to meet any of those deadlines. Thus, even if it were to reach the merits, this Court should dismiss Plaintiffs' case as time-barred entirely.

## II.    BACKGROUND

### a.   The Parties Are Mainly Based In Israel.

Plaintiff OSR R&D Israel Ltd. ("OSR Israel") is a "corporation organized under the laws of Israel," with its "principal place of business" in "Israel." Am. Compl. ¶ 38. Its parent entity, Plaintiff OSR Enterprises AG, is a "corporation organized under the laws of Switzerland," with its "principal place of business" in "Switzerland." *Id.* ¶ 37.

REE Automotive is a corporation organized under the laws of Israel, with its principal place of business at Kibbutz Glil-Yam 4690500. *See* Joshua Tech Decl. ¶ 3 (attached as Exhibit A). REE Holding is a corporation organized under the laws of Delaware; as a *holding* entity, REE Holding has no place of business or employees. *Id.* ¶ 4. REE USA is a corporation organized under the laws of Delaware; REE USA has 17 employees in total who operate remotely from several different locations in the U.S., including Texas, Michigan, and California, but currently has no principal office or facility anywhere in the U.S. *Id.* ¶ 5.

Although not parties to the dispute, the nine former OSR Israel employees Plaintiffs identify in their Complaint are Ohad Stauber; Ron Lupovici; Alexander Teryohin; Dmitri Gurevich; Arik Ben Shitrit; Denis Rodman; Alex Liberman; Yossi Varman; Eli

Sidi  (collectively, the "Former Employees"). *Id*. ¶ 3. Each one formerly worked at OSR Israel. And each has been or is currently employed at REE Automotive—***in Israel***. *Id*. ¶ 3.

### b.  Plaintiffs' Alleged Misconduct Mainly Occurred In Israel As Well.

Plaintiffs allege that, beginning in November 2019, several of their Former Employees began leaving OSR Israel to join REE Automotive, ***in Israel***. *See* Am. Compl. ¶¶ 18–24**.** The first among those who left OSR Israel was Ohad Stauber. *Id.* ¶ 20. Stauber worked in OSR Israel's R&D department for two years. *Id.* He later joined REE Automotive in December 2019. *Id*. ¶ 128.

According to Plaintiffs, "REE Automotive and REE USA were not attracted to Stauber for his non-automotive 3D mapping experience." *Id*. ¶ 116. After all, before joining OSR in 2017, Stauber "had no experience in the automotive industry" and, as Plaintiffs stress, his prior background in 3D mapping "has little relevance" for REE's platform. *Id*. ¶¶ 20, 119–20. Plaintiffs thus concede that the experience Stauber gained during his two-year stint at OSR is not relevant to the role he now has at REE Automotive. *See id.*

Rather, Plaintiffs maintain that Stauber's only value to REE was that he once had "high-level access to OSR's most valuable and secret technology." *Id*. ¶ 115. According to Plaintiffs, in the weeks and months leading up to his resignation from OSR in November 2019, Stauber downloaded roughly "100,000 of OSR's proprietary files" onto external hard-drives and his personal laptop. *Id.* ¶ 122. Plaintiffs further allege that Stauber, then, took those files with him, refusing to return external hard-drives containing OSR's "trade secrets" before joining REE in December 2019. *Id.* ¶ 124. Additionally, Plaintiffs allege another eight Former Employees joined REE during the next two years and that they, along with Stauber, made a concerted effort to misappropriate Plaintiffs' "trade secrets." *Id*. ¶¶ 129–33.

Defendants strongly dispute the veracity of these allegations, the notion that the vague, ill-

defined information Plaintiffs allude to in their Complaint amounts to a trade secret in the first place, and that REE ever received or used any of OSR's trade secrets at all. But, for purposes of this Motion, Defendants highlight only that the data-transfer and employee-recruitment efforts Plaintiffs point to as the crux of this dispute—as well as a (purported) police investigation into those allegations[1]—all occurred or are occurring ***in Israel***. *Id*. ¶¶ 113–133, 249.

This is, at bottom, a foreign dispute that should be transferred to another forum or, if it were to remain here, dismissed with prejudice for being facially time-barred.

## III.   LEGAL STANDARD

The forum-non-conveniens ("FNC") doctrine "empowers federal courts to dismiss an action when 'a foreign tribunal is plainly the more suitable arbiter of the merits of the case.'" *Path to Riches v. CardioLync*, 290 F. Supp. 3d 280, 284–85 (D. Del. 2018) (quoting *Sinochem Int'l v. Malaysia Int'l Shipping*, 549 U.S. 422, 425 (2007)). "When deciding a motion to dismiss that is based on FNC and other grounds, courts have 'discretion to respond at once to a defendant's [FNC] plea, and need not take up first any other threshold objection.'" *Id*. (quoting *Sinochem*). "Thus, where 'considerations of convenience, fairness, and judicial economy so warrant,' courts may exercise their discretion to dismiss on FNC grounds without deciding any jurisdictional questions.'" *Id* (quoting *Sinochem*). So, where appropriate, courts may "'take the less burdensome course' and 'dismiss on FNC grounds alone,' . . . . [including] before discovery has taken place and when relatively limited resources have been spent." *Id*. at 285–86 (quoting *Sinochem* and dismissing on FNC grounds). "[W]here subject-matter or personal jurisdiction is difficult to determine, and *forum non conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course." *Sinochem*, 549 U.S. at 436.

---

[1] *See Am. Compl.* ¶¶ 7, 249.

As for personal jurisdiction, the "plaintiff bears the burden to identify facts that demonstrate a prima facie case of jurisdiction." *Bulkley & Assocs. v. Dep't of Indus. Rels.*, 1 F.4th 346, 350 (5th Cir. 2021). For a "nonresident defendant," that requires the plaintiff to show that the court's exercise of jurisdiction comports with (1) the forum's "long-arm statute" and (2) the U.S. Constitution. *Id*. at 351; *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 231–32 (5th Cir. 2022) (same where plaintiff claims personal jurisdiction under federal long-arm law). In doing so, the court may not assume the truth of vague, conclusory jurisdictional allegations, even if uncontroverted. *See Panda Brandywine v. Potomac Elec. Power*, 253 F.3d 865, 868–69 (5th Cir. 2001) (affirming dismissal for lack of personal jurisdiction).

## IV.    ARGUMENT

### A.  Forum Non Conveniens: This Action Should Be Dismissed to Israel

"The essence of the forum non conveniens doctrine is that a court may decline jurisdiction and may actually dismiss a case, even when the case is properly before the court, if the case more conveniently could be tried in another forum." *Logan Int'l Inc. v. 1556311 Alberta Ltd.*, 929 F. Supp. 2d 625, 631 (S.D. Tex. 2012) (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 313 (5th Cir. 2008) and dismissing a trade-mark dispute filed in Texas because it held Canada was a more appropriate forum)). The doctrine allows "federal courts [to] relinquish their jurisdiction in favor of another forum." *Id.* at 631 (quoting *DTEX v. BBVA Bancomer, S.A.,* 508 F.3d 785, 794 (5th Cir. 2007)). Before doing so, however, a court must weigh (i) the plaintiff's choice of the forum against the adequacy of the alternative forum, (ii) "private interest" factors, and (iii) "public interest" factors. *See id.* Each one of those considerations favor dismissal here.

#### i.  Israel Can Provide an Adequate, Available, And More Appropriate Forum for this Dispute.

As a preliminary matter, courts generally defer to a plaintiff's choice of forum. They defer

far less, however, when plaintiffs are foreign companies—which is the case here. *See Piper Aircraft*, 454 U.S. at 255 ("[T]he presumption [concerning the plaintiff's choice of forum] applies with less force when the plaintiff or real parties in interest are foreign."). Little deference need be given to Plaintiffs' chosen forum in this case as a result.

Courts next look to whether an alternative forum is *available* and, if so, whether it would be *adequate*. Here, the Israeli Defendants are already present and operating from Israel.[2] *See* Am. Compl. ¶¶ 39–40; *see also* Tech Decl.¶ 3. They are thus subject to service of process there. In any event, the Israeli Defendants—along with REE USA—hereby consent to service in Israel.[3] An Israeli forum is, therefore, *available* to adjudicate this dispute. *See Path to Riches,* 290 F. Supp. 3d at 286 (applying FNC, dismissing action to Israel, and noting that "[t]he parties' undisputed residence in and consent to jurisdiction in Israel satisfies their duty to show that an alternative forum exists."); *see also Piper Aircraft*, 454 U.S. at 254 n.22; *Logan Int'l*, 929 F. Supp. 2d at 632.

As for *adequacy*, "[it] does not require that the alternative forum provide identical relief, either qualitative or quantitative, as an American court." *Logan Int'l*, 929 F. Supp. 2d at 632 (citing

---

[2] As Plaintiffs acknowledge in their Complaint, REE Automotive "is a corporation organized under the laws of Israel, with its principal place of business at 10 Aharon Maskin St., Tel-Aviv, Israel[.]" Am. Compl. ¶ 39. REE Holding—which, as the name denotes, is a *holding* company—"is a corporation organized under the laws of Delaware, with its principal place of business at[] . . . 10 Aharon Maskin St., Tel-Aviv, Israel[.]"
Notably, REE Holding's incorporation in Delaware is not, on its own, enough to find it must litigate in a U.S.-based forum. *See Path to Riches*, 290 F. Supp. 3d at 291 ("Even assuming PTR is a party in interest, its organization under Delaware law—PTR's sole tether to this forum—does not represent a 'bona fide connection' to Delaware sufficient to restore full deference to its forum choice.") "[C]ourts 'should not assign talismanic significance to the citizenship or residence of the parties' because '[t]he focus of the deference inquiry in the Supreme Court, [and] in this Court . . . is on convenience, not on the particular significance of a party's residence or citizenship.'" *Id*. at 291 (quoting *Kisano Trade & Inv. Ltd. v. Lemster*, 737 F.3d 869, 874–75 (3d Cir. 2013). So here, "[t]hat [REE Holding] has chosen to organize under the laws of Delaware is thus 'entitled to little consideration' in the FNC analysis, 'which resists formalization and looks to the realities that make for doing justice.'" *Path to Riches*, 290 F. Supp. 3d at 295 (quoting *Koster v. (Am.) Lumbermens Mut. Cas*, 330 U.S. 518, 528 (1947)).
[3] Defendants' being amenable to service in Israel alone tilts the adequacy-of-the-forum analysis in their favor. *See Path to Riches*, 290 F. Supp. 3d at 287–88 ("It is possible, albeit rare, for a plaintiff to show that an alternative forum is inadequate, despite defendants' amenability to service there[.] but there is nothing in the record to suggest that is the case here. In *Piper*'s often-cited footnote 22, the Supreme Court explained that in "rare circumstances . . . where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative.") (quoting *Piper Aircraft*, 454 U.S. at 254 n.22 and dismissing to an Israeli forum).

*DTEX*, 508 F.3d at 795 (5th Cir. 2007)). Rather, "[i]n a *forum non conveniens* context, the Supreme Court has stated that a dismissal 'may be granted even though the law applicable in the alternative forum is less favorable to the plaintiff's chance of recovery.'" *Id.* (quoting *Piper Aircraft,* 454 U.S. at 250). All the movant need show is that "the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy all the benefits of an American court." *Logan Int'l*, 929 F. Supp. 2d at 632 (citing *DTEX*, 508 F.3d at 795). Here, there is no doubt that Israel offers an adequate forum for this dispute.

To start, "[c]ourts routinely hold that Israel is a proper forum and dismiss cases on the grounds that it would be more appropriate to hear a case in Israel." *Israel Disc. Bank Ltd. v. Schnapp*, 505 F. Supp. 2d 651, 659 (C.D. Cal. 2007), *aff'd sub nom.*, 321 Fed. App'x 700 (9th Cir. 2009) (dismissing a dispute involving Israeli parties based on the FNC doctrine).[4] That holds true for cases involving trade-secret claims, including those brought under the Defense of Trade Secrets Act ("DTSA").[5] *See* Am. Compl. ¶ 276 ("Count I: Violation of the Defense Trade Secrets Act").

In *Path to Riches*, for instance, the district court dismissed a trade-secret action brought under the DTSA, holding that an Israeli court would provide a more appropriate forum for resolving the parties' dispute. *See Path to Riches*, 290 F. Supp. 3d at 295. There, even though the plaintiff- and defendant- entities were incorporated in Delaware, the court ultimately found that the gravity around the alleged misappropriation centered on people and acts taken in Israel. *Id*. at 284, 291–93. In fact there, like here, the plaintiff had alleged the defendant "misappropriated [the plaintiff]'s proprietary information by inducing [a former employee] to breach his fiduciary duties and employment agreement with [the plaintiff]." *Id*. at 284. And also like here, *some* parties had

---

[4] *See also Kisano*, 737 F.3d at 874 (3d Cir. 2013) (same); *Argoquest v. Israel Disc. Bank, Ltd.*, 228 Fed. App'x. 733, 734 (9th Cir. 2007) (same); *Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993) (same).
[5] Plaintiffs' DTSA claim is, in fact, the only basis they have for bringing a lawsuit in a federal forum at all.

*some* ties to the U.S. *Id.* at 283–84. Even so, the court found that an Israeli forum would be more suitable to adjudicate the dispute and dismissed the case under the FNC doctrine. *Id*. at 283–84, 295. That same finding should apply with equal if not more force here. *See generally id; see also Conflict Kinetics, Inc. v. Goldfus*, 577 F. Supp. 3d 459, 464 (E.D. Va. 2021) (dismissing, based on FNC, a trade-secret claim noting that "Israel also protects trade secrets under its commercial torts laws"); *Logan Int'l*, 929 F. Supp. 2d at 633 (dismissing a trade-secret dispute filed in Texas based on FNC, finding "that the Canadian court is an available and adequate forum for this dispute").

Aside from federal precedent, Defendants provide along with this Motion a Declaration prepared by Tamir Afori: the Head of Shibolet & Co.'s Intellectual Property Practice in Israel. Mr. Afori confirms in his declaration that: (1) Israel provides similar causes of action as those asserted by Plaintiffs in this action, including for "Misappropriation of Trade Secrets" and "unlawfully causing breach of contract;" (2) these Israeli causes of action offer similar relief as those sought by Plaintiffs in this action, including for monetary damages, injunctions, accounting, and transfer of infringing goods; and (3) an Israeli court would have jurisdiction over all Defendants because all Defendants consent to such jurisdiction and agree for REE Automotive (an Israeli entity) to accept service on each entity's behalf. *See* Afori Decl. ¶ 24 (attached as Exhibit B); *see also id.* ¶¶ 8–17 (discussing Israeli causes of action); *id.* ¶¶ 18–23 (discussing Israeli remedies); *id.* ¶¶ 24–32 (discussing Israeli personal jurisdiction). Those opinions are bolstered by a host of Israeli statutes, which plainly provide for trade-secret protection.[6]

### ii.  The Private-Interest Factors Strongly Favor Dismissal.

After determining that an adequate alternative forum exists, the analysis next turns on the

---

[6] *See* Section 5 of the Commercial Torts Law, 5759-1999; *see also* Machu, Matej, TRADE SECRET LAW IN THE U.S.A. AND ISRAEL IN COMPARATIVE PERSPECTIVE (May 1, 2014), available at https://ssrn.com/abstract=2536864 (comparing the similarities among U.S. and Israeli trade-secret and unfair-competition laws).

"private interests" involved. Factors relevant to this inquiry include: "[1] the relative ease of access to sources of proof; [2] the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [3] the possibility of view of premises, if view would be appropriate to the action; and [4] all other practical problems that make trial of a case easy, expeditious and inexpensive[.]" *DTEX*, 508 F.3d at 798 (5th Cir. 2007). Here, every private-interest factor strongly favors dismissal.

*1) The evidence is primarily, if not entirely, located in Israel*. The essence of Plaintiffs' claims is that Defendants misappropriated their trade secrets by hiring nine Former Employees of OSR Israel. *See* Am. Compl. ¶¶ 3–5. Plaintiffs allege that Defendants "aggressively recruited" the Former Employees to work for REE Automotive, and that, through files (allegedly) taken by one of the Former Employees (Ohad Stauber) and the knowledge acquired through the other eight Former Employees, Defendants have misappropriated OSR's trade secrets. *Id.* at ¶ 295; *id.* ¶¶ 3– 5. Plaintiffs claim that Stauber, in particular, transferred more than 100,000 files containing proprietary technology and other confidential information from OSR's systems onto a laptop and external hard-drives he later shared with REE—*in Israel*. *Id.* ¶¶ 113–28.

These allegations underscore how connected Plaintiffs' case is to Israel. Plaintiff OSR Israel—the entity at which the Former Employees previously worked and that performs the "research and development on OSR Enterprises' behalf"—is an **Israeli** corporation with its principal place of business in **Israel**. Am. Compl. ¶ 38. Defendant REE Automotive—the entity to which the "Former Employees" were allegedly recruited—is also an **Israeli** entity with its principal place of business **in Israel**. Am. Compl. ¶ 39.[7] The same is true for all nine Former Employees,

---

[7] Only one of the five parties named in this action actually has operations in the United States. *See* Am. Compl. ¶¶ 37– 41 (alleging that Plaintiff OSR Enterprises has its principal place of business in *Switzerland*, Defendant REE Holding has its principal place of business in *Israel*, and Defendant REE USA has its principal place of business in *Texas*).

who each reside *in Israel*. *See* Tech Decl. ¶ 3.

Critically, in their Rule-26(f) Report, Plaintiffs make clear that they intend to depose *all* nine Former Employees along with "yet-to-be-identified REE engineers and REE control persons" who, likely, too reside in *Israel*. *See* Rule 26(f) Report, D.E. 19 at 10. In fact, the only (potential) witnesses who may not be already in Israel are those who work for REE USA. That said, "none of REE's research-and-development department, programs, and initiatives, including those related to its intellectual property and product development efforts, have directly involved REE USA or REE Holding." Tech Decl. ¶ 9. Moreover, "none of the Former Employees work for REE USA or REE Holding." *Id.* ¶ 3. It is thus unlikely that local employees would have relevant personal knowledge.

Along with the main witnesses being in Israel, most—if not *all*—of the documentary evidence related to REE's intellectual property is in *Israel* as well. As noted above, Plaintiffs allege that the Former Employees were recruited by REE Automotive and shared protected trade-secret information with REE Automotive about OSR's "revolutionary technology." Am. Compl. ¶¶ 2–5. And as Plaintiffs note in the 26(f) Report, documents relevant to their claims include, for example, OSR documents, files, and other information in the possession of the Former Employees, all of whom reside in *Israel*; OSR documents, files, and other information in the possession of REE Automotive, who also resides in *Israel*; documents relating to REE Automotive's hiring of the Former Employees, all of which occurred in *Israel*; and REE Automotive's communications with the Former Employees, all of which also occurred in *Israel*. *See* Rule 26(f) Report at 6–10.

Against this backdrop, the "relative ease of access to proof" strongly favors dismissal. *Path to Riches,* 290 F. Supp. 3d at 293 (dismissing a trade-secret case on FNC grounds given most of the relevant evidence and witnesses were in Israel).[8]

---

[8] While there may potentially be some limited relevant evidence located in Texas, any such evidence would be minimal in comparison to the amount of evidence located in Israel.

If, however, this case were to proceed here instead, the material witnesses will likely need interpreters and many documents will have to be translated from Hebrew to English. *See* Tech Decl. ¶ 3. As courts have recognized, the translation and interpretation process is long and expensive—which is yet another consideration relevant to FNC. *See Urena Taylor v. Daimler Chrysler*, 196 F. Supp. 2d 428, 433 (E.D. Tex. 2001). As courts have further recognized, this complication does not exist when a case is sent from a U.S. forum to one in Israel given Israeli courts and Israeli citizens are typically proficient in English apart from Hebrew. *See Path to Riches,* 290 F. Supp. 3d at 292, n.9 ("It is also noteworthy, in terms of relative ease of access to proof, that 'documents in English need not be translated because Israel courts are typically proficient in English.'") (quoting *Kisano*, 737 F.3d at 878).

*2) **The material witnesses are beyond the Court's subpoena power, and the cost of attendance for willing witnesses will be high.** Almost all material witnesses—for both sides— reside in Israel, leaving this Court unable to compel the attendance of any nonparty who may be unwilling to volunteer their participation in this case. *See, e.g., DTEX*, 508 F.3d at 799  (5th Cir. 2007) ("The inability to compel the attendance of numerous unwilling witnesses weighs heavily in favor of dismissal."). Though even for *willing* Israeli witnesses, the expense of securing their attendance still tilts in favor of dismissal—as the travel, lodging, and meal costs, among others, would be prohibitively more than those for any U.S.-based witness to travel to Israel. *See BBC Chartering & Logistic GmbH & K.G. v. Siemens Wind Power A/S*, 546 F. Supp. 2d 437, 447 (S.D. Tex. 2008). Remote testimony, too, would be problematic because Israel is *eight* hours (and several time-zones) ahead of Austin, Texas, which would likely create complications for court reporters, videographers, counsel, and the witnesses themselves. Israel also operates on a Sunday-to-Thursday workweek such that, if this case were tried here, the parties and the Court here would

lose one day with Israeli witnesses and vendors as well.

>    ***3) The possibility of viewing the premises is not relevant.*** The view of the premises is not a pertinent factor here. It thus tilts in favor of neither side.

>    ***4) It would be costly and impractical to litigate this case in Texas.*** Trial in this Court will be difficult, time consuming, and expensive. Again, most (if not all) of the material witnesses reside in Israel and either may not speak fluent English or will wish to testify in their native tongue. Tech Decl. at ¶ 3. This will require interpreters and, likely, "check" interpreters as well, which will only increase the time and costs of litigating in a Texas forum. *See BBC Chartering,* 546 F. Supp. 2d at 448; *Ibarra v. Orica USA, Inc.*, No. DR-09-CV-059-AM/VRG, 2011 WL 13180231, at *11 (W.D. Tex. Sept. 21, 2011), *aff'd sub nom.*, *Ibarra v. Orica U.S.A. Inc*., 493 Fed. App'x 489 (5th Cir. 2012). There is also a risk of juror confusion and that some information will get lost in translation if this action were tried through interpreters and translated documents. *See Ibarra*, 2011 WL 13180231, at *11. Substituting deposition testimony for live testimony is no solution either, as this Circuit has repeatedly stressed that "conducting a substantial portion of a trial on deposition testimony precludes the trier of fact from its most important role: evaluating the credibility of witnesses." *Torreblanca de Aguilar v. Boeing*, 806 F. Supp. 139, 144 (E.D. Tex. 1992); *see also Perez & Compania (Cataluna), S.A. v. M/V Mexico I*, 826 F.2d 1449, 1453 (5th Cir. 1987) ("[T]o fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition [testimony] is to create a condition not satisfactory to court, jury or most litigants.") (internal quotation omitted).

>    Taken together, the private-interest factors strongly favor dismissal.

### iii.   The Public-Interest Factors Strongly Favor Dismissal As Well.

Where, as here, an adequate alternative forum is available and the private interest factors

favor dismissal, the Court need not consider the public interest factors. *See Baumgart v. Fairchild Aircraft,* 981 F.2d 824, 837 (5th Cir. 1993). This Court may thus end the inquiry here. That said, the public-interest factors strongly favor dismissal as well.

"The central question a court must answer when considering the public interest is whether the case has a general nexus with the forum sufficient to justify the forum's commitment of judicial time and resources to it." *Seguros Commercial v. Am. President,* 933 F. Supp. 1301, 1313 (S.D. Tex. 1996). In answering this question, courts consider the following factors: (1) the administrative difficulty flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws, or in the application of foreign law. *Id.*

*1) Court congestion.* As is true in most federal courts, this Court carries an extremely heavy caseload.[9] This case would only add to its docket, additionally burdening the Court of its scarce time and resources.

*2) Israel has the strongest local interest.* Plaintiffs seek redress for the misappropriations of trade secrets *they* allege were developed and appropriated *in Israel.* Israeli courts have an interest in adjudicating local disputes of this nature. Moreover, Plaintiffs allege that the "Israeli police confirmed"—two days *before* this lawsuit was filed—"that there is an investigation 'currently being conducted' by a special team of the Israeli police's cybercrime division, together with the head of the division and with the guidance of an Israeli district attorneys' office, 'against Ohad Stauber and REE corporation, inter alia, under suspicion of theft and computer crimes.'" Am. Compl. ¶ 249. Legal proceedings over this dispute are thus already underway *in Israel.*

---

[9] Last year alone, 4,211 cases were filed last year in the Western District of Texas. Caseload Statistics Data Tables, USCOURTS.GOV, https://www.uscourts.gov/sites/default/files/data_tables/jb_c1_0930.2022.pdf (last visited May 2, 2023). Further, the median time to trial is 30.8 months. Caseload Statistics Data Tables, USCOURTS.GOV, https://www.uscourts.gov/statistics/table/c-5/judicial-business/2022/09/30 (last visited May 2, 2023).

The same, however, cannot be said about Texas. To our knowledge, there are no active investigations or related legal actions being considered by government officials here. There is, in fact, no significant tie to this forum for either side at all—save for REE USA's limited presence in Texas. It would, as a result, be unfair to ask a local jury to sit through a lengthy trial for a dispute that has almost no tie to where they live. *See Urena*, 196 F. Supp. 2d at 434; *see also Path to Riches*, 290 F. Supp. 3d at 293 ("Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.") (quoting *Gulf Oil v. Gilbert*, 330 U.S. 501, 508–09 (1947)). An Israeli forum, by contrast, would have a direct interest in resolving a dispute among local companies and several people who—for both sides—work and reside there.

   ***3) Israeli law will be of central importance to this dispute.*** The law of the forum with the most significant relationship to the occurrence and the parties governs the substantive legal issues. *See Urena*, 196 F. Supp. 2d at 434. As between Israel and Texas, there can be no doubt that Israel has the most significant relationship to the occurrence and the parties. As stated above, most of the parties are incorporated or have their principal places of business in Israel, most of the evidence is in Israel, and the alleged misappropriation of trade secrets occurred in Israel. Therefore, under Texas' conflicts-of-law analysis, Israeli law would apply to this dispute.

   ***4) Dismissal avoids unnecessary conflicts and applications of foreign law.*** It would be most efficient for an Israeli court to preside over a case turning on Israeli law. U.S. courts heavily favor dismissal of trade secret cases in such circumstances. *See id.; Logan,* 929 F. Supp. 2d at 634 (dismissing a trade-secret dispute in Texas because "[i]t appears likely that Canadian law will govern the fundamental liability questions in this case because Canada has the 'most significant relationship' to the alleged misappropriation"—a factor that weighed "heavily in favor of trying this case in Canada"); *Conflict Kinetics*, 577 F. Supp. 3d at 466 (dismissing a trade-secret dispute

given it was "likely that Israeli law, and not United States law, will apply to many of the claims in this case"); *Path to Riches*, 290 F. Supp. 3d at 293 (same under the DTSA).[10]

The *Path to Riches* court underscored this exact point:

> Defendants argue that, because the alleged trade secrets were developed by MMT in Israel, Jeremy's employment contract with MMT was executed and performed there, and the alleged misappropriation of trade secrets "all took place while Jeremy and Gam were in Israel," Israel and its courts have a strong interest [in this] this dispute, whereas Delaware does not. ***Defendants further argue that . . . substantive Israeli law will likely govern most of PTR's claims. I agree and conclude that this dispute lacks any meaningful connection to Delaware and would pose administrative difficulties by requiring the court to . . . to discern and apply Israeli substantive law to some or most claims***. . . . [Indeed, the Supreme Court in] *Piper* instructs that FNC 'is designed in part to help courts avoid ... complex exercises in comparative law.' Thus, "***where the court would be required to untangle problems*** in conflict of laws, and ***in law foreign to itself," the public interest factors point towards dismissal."*** (quoting *Piper*, 454 U.S. at 251).

*Path to Riches*, 290 F. Supp. 3d at 293–94 (emphasis added). That same finding applies here, too.

Accordingly, the public-interest factors strongly favor dismissal as well.

* * *

This Court sits more than 7,100 miles and several continents away from where *Plaintiffs* allege the core wrongdoing occurred: ***Israel***. Plaintiffs seeking redress in a U.S. forum in this circumstance is quintessential forum-shopping, precisely what the FNC doctrine is intended to protect against. *See Piper Aircraft*, 454 U.S. at 249 n.15. Beyond that, every factor courts look to in considering FNC overwhelmingly favors dismissal. Plaintiffs thus, respectfully, ask this Court to dismiss for FNC.

---

[10]   The Supreme Court in *Piper* made this point as well. As the Court explained, "The doctrine of *forum non conveniens*[] . . . is designed in part to help courts avoid conducting complex exercises in comparative law. As we stated in *Gilbert*, the public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'" *Piper*, 454 U.S. at 251 (internal citation omitted).

**B. At a Minimum, the Israeli Defendants Should Be Dismissed for Lack of Personal Jurisdiction.**

A court lacks "personal jurisdiction" over a "nonresident defendant" where, as here, exercising jurisdiction violates (1) the forum's "long-arm statute;" or (2) the U.S. Constitution. *See Bulkley*, 1 F.4th at 351; *see also Douglass*, 46 F.4th at 231–32 (5th Cir. 2022) (same under federal long-arm statute). Additionally, the "plaintiff bears the burden to identify facts that demonstrate a prima facie case of jurisdiction." *Bulkley*, 1 F.4th at 350. The court may not assume the truth of vague, conclusory jurisdictional allegations, even if uncontroverted. *See Panda Brandywine*, 253 F.3d at 868–69 (5th Cir. 2001). Here, Plaintiffs' vague, conclusory jurisdictional allegations are facially deficient, especially those seeking to accomplish jurisdictional veil piercing.

**i. Plaintiffs Jurisdictional Group-Pleading Allegations Are Fundamentally Defective.**

A complaint should be dismissed when the plaintiff engages in impermissible group pleading. *See, e.g.*, *Armstrong v. Ashley*, 60 F.4th 262, 281 (5th Cir. 2023) (affirming dismissal for group pleading of material facts). That is because a court may not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant" when, like here, the plaintiff fails to "specifically [plead]" the "connection between the individual defendant" and the at-issue facts. *Southland Sec. v. INSpire Ins. Solutions*, 365 F.3d 353, 365 (5th Cir. 2004) (affirming dismissal for group pleading).

Here, Plaintiffs gloss over their pleading obligations by referring to all three REE Entities collectively to give the appearance—without specifically alleging—that all three made the same contacts with this forum. *See generally* Am. Compl. (referring to "REE" generally as well as "REE Automotive, REE USA, and REE Holding" collectively). This group-pleading tactic makes it

impracticable for Defendants and, for that matter, the Court to meaningfully analyze Plaintiffs' alleged minimum-contacts. That is particularly prejudicial with respect to REE Automotive and REE Holdings, who Plaintiffs concede are Israeli—and thus foreign—entities. *See* Am. Compl. ¶¶ 39–40; *see also Special Indus. v. Zamil Grp.*, 578 Fed. App'x 325, 328 (5th Cir. 2014) (noting the "minimum contacts analysis is particularly important when the defendant is from a different country") (quoting *BMC Software*, 83 S.W.3d at 795).

Plaintiffs' amended complaint makes nominal changes which give the *impression* of fixing the issue—but the problem remains. For instance, in sections where Plaintiffs had referred to "REE" as a group, Plaintiffs did no more than swap the word "REE" with the phrase "REE Automotive, REE USA, and REE Holdings"—making no effort to delineate each entity, much less identify *who* did *what* and *where*. *See* Am. Compl. ¶¶ 43–53. These superficial, band-aid amendments do nothing to repair Plaintiffs' defective group pleadings. (Further, Plaintiffs still kept in several allegations to "REE," generally, in their jurisdictional allegations. *See id.*)

Moreover, for the few allegations that are now *somewhat* more delineated, they advance allegations that are factually untrue and misleading. For example, Plaintiffs take various public statements—including press releases issued by third parties—completely out of context, making it seem as if they apply to all three REE Entities when, in fact, they do not. *Compare, e.g.*, Am. Compl. ¶¶ 45, 51 (suggesting REE Automotive and REE Holding are themselves targeting Texas by engaging in an Austin-based "integration center"), *with* [https://www.pfdevelopment.com/news/p/item/41875/ree-automotive-opens-first-north-american-headquarters-and-integration-center-in-pflugerville-texas-as-the-company-readies-for-production-in-2023](https://www.pfdevelopment.com/news/p/item/41875/ree-automotive-opens-first-north-american-headquarters-and-integration-center-in-pflugerville-texas-as-the-company-readies-for-production-in-2023) (not delineating which REE Entity is engaging in this Texas contact). Plaintiffs do the same with various SEC filings, taking quotes referring to "REE" collectively in those filings

out of context, including references to a Texas-based facility that Defendants have already confirmed through a prior declaration[11] was leased to **only** REE USA—not REE Holding or REE Automotive. *Compare, e.g.*, Am. Compl. ¶ 45 & n.2 (suggesting REE Automotive and REE Holding entered into a lease in Texas through a general REE definition in SEC filings), *with* REE Automotive Ltd. Form 20-F (Mar. 28, 2022) at F-36 ("On March 11, 2022, REE Automotive **USA** Inc. entered into a lease agreement for an integration center in Austin Texas, the United States.").

Indeed, the thrust of Plaintiffs' now-nominally-delineated jurisdictional allegations revolve around a Texas-based facility. Am. Compl. ¶¶ 45–46, 48, 51–53. Only **REE USA**, on behalf of itself alone and **no other REE Entity**, is a party to the agreements related to that Texas facility. Tech Decl. ¶ 5. That Texas facility is not even currently manufacturing any products (and has not). *See id.* Further, Plaintiffs' allegations that REE Automotive and REE Holding have numerous employees in Texas and throughout the U.S. is completely false. *See* Am. Compl. ¶ 50. REE Automotive has no employees in the U.S., and REE Holding has no employees at all. *See* Tech Decl. ¶¶ 3–4. Moreover, neither REE USA nor REE Holding engage in any Research & Development ("R&D"), and REE Automotive does not engage in any R&D in the U.S. *See* Am. Compl. ¶ 216; Tech Decl. ¶ 7.

Accordingly, as a threshold matter, Plaintiffs' Amended Complaint should be dismissed because they have failed to meet their jurisdictional pleading burden. *See Sefton v. Jew,* 201 F. Supp. 2d 730, 742 (W.D. Tex. 2001) (refusing to exercise specific jurisdiction in an intellectual-property dispute because "Plaintiff's Complaint merely state[d] that the Defendants, *collectively*, infringed Plaintiff's works"); *see also Jonathan Paul Eyewear v. Live Eyewear*, No. A-12-CA-908-SS, 2013 WL 12090073, at *4 (W.D. Tex. Aug. 5, 2013) ("The factual allegations focus solely

---

[11] *See* Joshua Tech Declaration dated March 16 2023 (D.E. 22, Exhibit A at ¶ 5).

on the collective 'Defendants' improper use of the 'infringing marks,' . . . . Such generalized, collective allegations of tortious conduct are insufficient to justify exercising specific jurisdiction over Hardy [specifically].");  *Engel v. W.R. Berkley*, No. 3:00-cv-1779-H, 2001 WL 238113, at *5 (N.D. Tex. Mar. 6, 2001) (holding plaintiff "failed to make out a prima facie case for personal jurisdiction over Defendant W.R. Berkley Corporation" after "attempt[ing] to establish specific jurisdiction over W.R. Berkley Corporation by attributing conduct to 'Defendants' collectively"). To the extent Plaintiffs sought to establish jurisdiction over each Defendant directly, Plaintiffs needed to actually proffer true facts relating to each Defendant—*not* blur the boundaries between distinct entities to incorrectly suggest they all engaged in the same contacts with this forum, which Plaintiffs have now done twice.

### ii.  Plaintiffs Fail To Establish A *Prima Facie* Basis To Warrant "Jurisdictional Veil Piercing."

Because Plaintiffs all but concede this Court lacks *direct* personal jurisdiction over the Israeli Defendants, Plaintiffs instead focus on asking this Court to find it can *indirectly* exercise jurisdiction over the Israeli Defendants through REE USA. Am. Compl. ¶¶ 50–51. Yet even if one were to assume that Plaintiffs sufficiently alleged jurisdiction over REE USA (they have not), Plaintiffs' "jurisdictional veil-piercing" attempt against the Israeli Defendants would *still* fail.

Absent exceptional circumstances, a Texas court does not have personal jurisdiction over a foreign company just because a subsidiary resides or has committed a tort in Texas. Texas law indeed **_presumes_** that separate entities—even if affiliated—are distinct for jurisdictional purposes. *See BMC Software*, 83 S.W.3d at 798 ("Texas law presumes that two separate corporations are indeed distinct entities"); *Commonwealth Gen. v. York*, 177 S.W.3d 923, 925 (Tex. 2005); *Anchia v. DaimlerChrysler AG*, 230 S.W.3d 493, 500–02 (Tex. App.—Dallas 2007). Plaintiffs have not

met—and cannot meet—that stringent burden.[12]

### 1.  REE USA Is Not An "Alter Ego" Of The Israeli Defendants.

A court may not "disregard the separate legal identities of corporations" when the plaintiff fails to establish that the "parent controls the internal business operations and affairs of the subsidiary" to such a degree that the "two entities cease to be separate" so that the "corporate fiction should be disregarded to prevent *fraud* or *injustice*." *BMC Software*, 83 S.W.3d at 798–99; *Gentry v. Credit Plan of Houston*, 528 S.W.2d 571, 573 (Tex. 1975) (same). That is, the presumption that legal entities are distinct must be enforced unless the various entities are truly acting as a single unit in furtherance of fraud or manifest injustice.

Accordingly, plaintiff fails to allege a jurisdictional alter-ego theory where, as here, they simply allege that (1) the parent owns 100% of its subsidiaries' stock;[13] (2) the various entities share officers, directors, and other managerial employees;[14] (3) the parent makes certain decisions for its subsidiaries;[15] (4) the subsidiary does not comply with all corporate formalities;[16] (5) the subsidiary is underfunded;[17] or (6) a combination of the above[18]— which is all Plaintiffs manage

---

[12] Although Plaintiffs brought a claim under the DTSA, Texas law governs alter ego determinations that bear on the exercise of personal jurisdiction. *See Licea*, 952 F.3d at 212 (5th Cir. 2015) ("Texas law also governs the alter ego determinations, which bear on the exercise of jurisdiction over and proper service on FPMC and FBMC."); *see also Hargrave v. Fibreboard*, 710 F.2d 1154, 1159 (5th Cir. 1983) (noting that state law of the forum controls whether a defendant is amendable to service through its alter egos under a long-arm statute).

[13] *Commonwealth Gen.*, 177 S.W.3d at 925 (Tex. 2005) (100% ownership insufficient).

[14] *BMC Software*, 83 S.W.3d at 799 (Tex. 2002) (overlapping officers insufficient).

[15] *PHC-Minden v. Kimberly-Clark*, 235 S.W.3d 163, 175 (Tex. 2007) (exercising some control over subsidiary insufficient); *Semperit Technische v. Hennessy*, 508 S.W.3d 569, 586 (Tex. App.—El Paso 2016, no pet.) (same).

[16] *TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., L.L.C.*, 515 S.W.3d 1, 9 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) (declining "to conclude that the failure to follow corporate formalities" was sufficient "to demonstrate that the two entities are one.").

[17] *Sightline Payments v. Everi Holdings*, No. 6:21-cv-01015, 2022 WL 2078215, at *6 (W.D. Tex. June 1, 2022) (underfunding insufficient).

[18] *Hargrave*, 710 F.2d at 1160 (5th Cir. 1983) ("100% stock ownership and commonality of officers and directors" insufficient); *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978) (same); *Capital Fin. Com. v. Sinopec Overseas Oil*, 260 S.W.3d 67, 88–90 (Tex. App.—Houston [1st Dist.] 2008) (same); *Greenfield Energy v. Duprey*, 252 S.W.3d 721, 732 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (same); *Gardemal v. Westin Hotel*, 186 F.3d 588, 594 (5th Cir. 1999) (100% stock ownership, commonality of officers/directors, and underfunding insufficient); *Fellowship Filtering Techs. v. Alibaba.com*, No. 2:15-cv-2049-JRG, 2016 WL 6917272, at *4 (E.D. Tex. Aug. 31, 2016) (100% stock ownership, commonality of officers/directors, and some degree of control insufficient).

to allege here, and do so in a conclusory manner at that. *See* Am. Compl. ¶¶ 261–67. Plaintiffs have thus failed to proffer a *prima facie* basis for specific jurisdiction over the Israeli Defendants.

Indeed, the Fifth Circuit and Texas Supreme Court have each reversed trial courts for exercising alter-ego-based jurisdiction in cases that presented far more compelling, uncontroverted facts than those Plaintiffs allege here. *See Licea v. Curacao Drydock*, 952 F.3d 207, 213–14 (5th Cir. 2015) (refusing alter-ego jurisdiction even where "(1) all of the entities report to and are run by the same founder; (2) they share a group administrative office that combines several functions together; and (3) management of the entities is controlled at the [parent-entity] level"); *BMC Software*, 83 S.W.3d at 799 (same even though the plaintiff demonstrated the parent (1) provided stock options for its subsidiary's employees; (2) listed the subsidiary's financial performance in its own annual reports; (3) performed personnel and marketing services for the subsidiary; (4) used the same letterhead and product descriptions; and (5) shared the same officers and offices).

Beyond that, Plaintiffs' vague, conclusory allegations are largely misleading, if not outright untrue. "[A]lthough REE Holding and REE USA are owned by and thus subsidiaries of REE Automotive, each is a separate, distinct corporate entity from REE Automotive." Tech Decl. ¶ 6. For instance, "[REE USA's] employees are paid by REE USA directly, and their positions are separate and distinct from other REE entities, including REE Holding and REE Automotive." *Id.* ¶ 5. Plaintiffs' suggestions otherwise are based on no more than pure speculation.

### 2. REE USA Is Not A Mere "Agent" Of The Israeli Defendants.[19]

Plaintiffs' fallback tactic for obtaining specific jurisdiction over the Israeli Defendants is alleging that the Israeli Defendants maintain a principal-agent relationship with REE USA. To

---

[19] Despite asserting that there is an agency-based theory supporting specific jurisdiction over REE Holdings through REE USA, *see* Am. Compl. ¶ 55, Plaintiffs' substantive agency allegations are structured to at most support only jurisdiction over REE Automotive through REE USA and REE Holdings, *see id.* ¶¶ 269–75.

obtain jurisdiction on this basis, however, Plaintiffs must *demonstrate* that REE USA and REE Holdings are no more than mere agents of REE Automotive who, as the principal, exercises so much control over them that it would be constitutionally permissible for this Court to disregard their corporate form and attribute the subsidiaries' contacts with Texas onto the parent entities. This, as with alter-ego-based jurisdiction, requires meeting a steep burden—one that Plaintiffs fall well short of satisfying as well.

Notably, "Texas law does not presume agency [for jurisdictional purposes], and the party who alleges it has the burden of proving it." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) (citing *Buchoz v. Klein*, 184 S.W.2d 271, 271 (Tex. 1944)); *see also Greenfield*, 252 S.W.3d at 733. Thus, here, Plaintiffs must show that "[the Israeli Defendants] controlled both the means and details of the [REE USA]'s activities [in Texas]" that gave rise to this dispute. *Greenfield*, 252 S.W.3d at 733. Plaintiffs made no such showing.

To start, Plaintiffs do not support their (legal) conclusion that REE Automotive "controls" REE USA or REE Holdings, *see* Am. Compl. ¶ 270, let alone explain how REE Automotive controlled REE USA's and REE Holdings' decision to perform specific, jurisdictionally relevant contacts in this forum. *See Greenfield*, 252 S.W.3d at 733 (collecting cases dismissing complaints on these grounds); *Companion v. Palermo*, 723 F.3d 557, 559 (5th Cir. 2013) ("[A] a plaintiff makes a prima facie showing of minimum contacts when his claim arises from the defendant's contact with the forum.") (citing *Helicopteros Nacionales v. Hall*, 466 U.S. 408 (1984)). The only *specific* facts Plaintiffs point to for supporting agency jurisdiction against REE Automotive are that it has (i) many of the "same executives as REE USA and REE Holding" and (ii) previously announced it would open an "integration center" in the U.S. *See* Am. Compl. ¶ 281–82. Neither one of those allegations are enough to satisfy Plaintiffs' pleading burden. *See Greenfield*, 252

S.W.3d at 732–33 (rejecting agency- and alter-ego-based jurisdiction on foreign parties based on the contacts of their wholly-owned Texas subsidiaries, stressing that "[i]t is not enough to show that the parent entities 'controlled the internal business operations and affairs of the [subsidiary] entities to any extent greater than that normally associated with common ownership and directorship.'"); *Orloff v. Saipem*, 280 F. Supp. 2d 620, 623 (S.D. Tex. 2003), *aff'd*, 92 Fed. App'x 974 (5th Cir. 2004) (refusing agency jurisdiction over a foreign parent entity, stressing mere ownership and control is insufficient and that a "subsidiary's doing business in a particular state does not ordinarily confer jurisdiction over the foreign parent, regardless of the financial relationship") (internal citation omitted)).

More fundamentally, Plaintiffs' group pleadings prevent one from meaningfully assessing which specific acts—*i.e.*, "contacts"—REE USA or REE Holdings performed in or have with Texas. And so, even if one were to assume REE USA and REE Holding are agents of REE Automotive, Plaintiffs would still have to show that this Court can exercise jurisdiction over them without offending Texas' long-arm statute *or* the U.S. Constitution's due-process standards. *See Sinopec Overseas Oil & Gas*, 260 S.W.3d 67 at 92; *see also IRA Res.*, 221 S.W.3d at 597–99. But as detailed in Section V.a, *supra*, Plaintiffs do not clarify *which* REE Entity did *what*, *when* and *where*; instead, Plaintiffs defined all three REE Entities as "REE," collectively, and generally referred to them as one unit from there. (*See* Am. Compl. at p. 2.) Plaintiffs have thus failed to allege that REE USA purposefully availed itself of this forum. As a result, Plaintiffs' agency-based allegations fail for this reason as well. *See Sefton,* 201 F. Supp. 2d at 742; *Jonathan Paul Eyewear*, 2013 WL 12090073, at *4; *Engel v. W.R. Berkley*, 2001 WL 238113, at *5.

### 3. Plaintiffs Cannot Establish Co-Conspirator Jurisdiction, Either.

Plaintiffs have amended their complaint to add Count IV for Civil Conspiracy to,

seemingly, seek jurisdiction over REE Holding and REE Automotive based merely on the contacts REE USA has with this forum. *See* Am. Compl. ¶ 313 (alleging that, "to the extent [the REE Entities] do not act as alter egos of each other and as a single entity, entered into a conspiracy."). This apparent jurisdictional theory is contrary to the law and therefore fails.

First, as a threshold matter, "personal jurisdiction over one defendant conspirator is not sufficient to establish personal jurisdiction over a nonresident coconspirator." *See Chow v. U.S.*, 2021 WL 3438365, at *2 (5th Cir. Aug. 5, 2021) (citing *Thomas v. Kadish*, 748 F.2d 276, 282 (5th Cir. 1984)); *Delta Brands v. Danieli*, 99 Fed. App'x 1, 6 (5th Cir. 2004) (no personal jurisdiction in trade secret misappropriation case, holding plaintiff needed to show that the defendant "individually, and not as part of the conspiracy, had minimum contacts with Texas"); *Rusesabagina v. GainJet Aviation*, 2022 WL 17331272, at *6 (W.D. Tex. Nov. 29, 2022) (collecting cases rejecting "conspiracy theory of jurisdiction"); *State Massage Therapy Boards v. Mendez Master Training Ctr.*, 2018 WL 534540, at *5 n.9 (S.D. Tex. Jan. 24, 2018) (same).

Second, *conspiracy* is not even a viable cause of action here, let alone sufficient for jurisdictional purposes. Israeli law—which would govern the substantive issues in this action (*see supra* § IV.A.iii.3)—does not recognize a cause of action for civil conspiracy. *See* Afori Dec. ¶ 16. And even under Texas law, parent and subsidiary entities cannot conspire with one another. *See Atl. Richfield v. Misty Prods.*, 820 S.W.2d 414, 420 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (citing *Copperweld v. Indep. Tube*, 467 U.S. 752, 777 (1984)).

### iii.  Any Additional Amendment Would Be Futile.

Presumably, Plaintiffs will seek to correct their jurisdictional-pleading deficiencies through another amended complaint. Such an amendment, however, would be futile, a point made even more clear after Plaintiffs' first amendment. The bulk—if not entirety—of this dispute arises out

of Israel. It is hard to see how the Israeli Defendants have so many "contacts" with Texas from which Plaintiffs' Israeli-based claims "arise" to reflect that each Israeli Defendant "purposefully availed" themselves of Texas' benefits and protections in a way that rendered it "foreseeable" they could be sued here such that exercising jurisdiction over them would be "fair and reasonable." *Bulkley*, 1 F.4th at 351 (noting analysis under Texas long-arm statute); *Douglass*, 46 F.4th at 231–32 (same under federal long-arm statute); *Special Indus.*, 578 Fed. App'x at 328 (discussing jurisdictional factors court must weigh (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 292 (1980)). Indeed, Plaintiffs' repeated failure to present a *prima facie* case of jurisdiction reinforces precisely why this dispute should be litigated in Israel, if anywhere at all. *See Sinochem*, 549 U.S. at 425 (2007) (noting where personal jurisdiction is unclear but *forum non conveniens* is warranted, a district court should dismiss on the latter grounds to avoid unnecessary litigation costs).

### C.  Plaintiffs' Claims Are Time-Barred.

To the extent the Court addresses the merits of Plaintiffs' claims, the Amended Complaint should be dismissed in full because all of the claims are facially time-barred.

Plaintiffs advance claims for state and federal trade secret misappropriation, unfair competition, and civil conspiracy. *See* Am. Compl., Counts I–IV. The DTSA's statute of limitations governs Plaintiffs' federal claim, and Texas' statutes of limitations govern Plaintiffs' state-law claims. *See Grand Isle Shipyard v. Seacor Marine*, 589 F.3d 778, 809 (5th Cir. 2009) ("federal question" issues are governed by "federal common law choice-of-law" rules, the "content" of which is provided by the "Restatement (Second) of Conflicts of the Law"); Restatement (Second) of Conflicts of Law § 142 (forum's own statute of limitations apply when it bars the claim); *Clean Energy v. Trillium Transportation Fuels,* 2021 WL 3410668, at *3 (S.D.

Tex. July 6, 2021) (applying DTSA's limitations period to federal claim, and Texas' limitations periods to state claims, including under TUTSA), *R&R adopted*, 2021 WL 3406656 (S.D. Tex. Aug. 3, 2021) (overruling objections in full).

Under both Texas and federal law, a plaintiff must commence a trade secret misappropriation claim ***within three years*** from when it discovered, or should have discovered, that the misappropriation began. *See Clean Energy,* 2021 WL 3410668, at *3 (citing Tex. Civ. Prac. & Rem. Code Ann. § 16.010 (TUTSA limitations period)) and 18 U.S.C. § 1836(d) (DTSA limitations period)). And a plaintiff must commence an unfair competition claim ***within two years*** from when the unfair competition began. *See R. Ready Prods. v. Cantrell*, 85 F. Supp. 2d 672, 693 (S.D. Tex. 2000) ("[U]nfair competition claims are subject to a two year statute of limitations." (citing Tex. Civ. Prac. & Rem. Code Ann. § 16.003)). Relatedly, a plaintiff must commence a civil conspiracy claim within the limitations period of the "underlying tort" (here, either two or three years, discussed above). *Agar v. Electro Cirs.*, 580 S.W.3d 136, 142 (Tex. 2019) (holding "civil conspiracy is not an independent tort" such that it "does not have its own statute of limitations"). Each of these limitation periods begin to accrue when the defendant unlawfully acquired the alleged trade secret or confidential information. (*i.e.*, when the misappropriation/competition was alleged to have commenced). *See, e.g.*, *Gen. Universal Sys. v. HAL*, 500 F.3d 444, 451 (5th Cir. 2007) (unfair competition claim began to accrue when defendants relied on trade secrets found in stolen laptop to accelerate the "development and marketability" of its own product); *Cantrell*, 85 F. Supp. 2d at 693 (Tex. 2000) (unfair competition claim began to accrue when former employee left to work for a competitor).

Here, Plaintiffs' Amended Complaint makes plain they cannot meet any of the above timeframes. According to Plaintiffs' own allegations, the relevant misappropriation/competition

(Stauber's alleged theft of Plaintiffs' "Stolen Files") began in September 2019. *See* Am. Compl. ¶¶ 123–24, 173–75 (alleging that Stabuer began stealing OSR's trade secrets and otherwise-confidential information while attending a trade show in September 2019). Additionally, Plaintiffs concede they learned about Stauber's misappropriation by no later than November 25, 2019: his last day at OSR. *See id.* ¶¶ 119–25. Indeed, by then Stauber had already (i) notified Plaintiffs he was leaving to join REE Automotive, *id.* ¶¶ 123–24; (ii) returned his laptop (the Stauber Laptop) with "gigabytes" of "proprietary information" totally "deleted," including "copies of the Stolen Files" and "a folder containing proprietary work developed by a colleague at OSR, which Stauber had no legitimate reason to have had on his laptop in the first place," *id.* ¶ 125; and (iii) outright refused to turn in a four-terabyte external hard-drive housing OSR's "source code," "proprietary files" and "over 100,000 of OSR's proprietary files totaling more than 20 gigabytes" that "included, but were not limited to, OSR's proprietary source code packages for the EVOLVER platform contained in the folder 'IAA2019,' system drawings and blueprints, schematics, data sheets, market research, technical analyses, interface designs, and applications of AI algorithms (the 'Stolen Files')." *Id.* ¶¶ 121–25.

So according to Plaintiffs' *own* allegations the statutes of limitations for their unfair-competition and trade-secret claims (and the relevant conspiracy-claim theory) ran by no later than November 25, 2021 and 2022, respectively. Plaintiffs, however, commenced this action on December 16, 2022 (Dkt. #1), well after all limitations periods expired.

The Texas Supreme Court has repeatedly stressed that "parties can generally detect trade secret misappropriation within the statute of limitations period." *Wagner & Brown v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001) (internal citations omitted). In *Wagner*, for instance, the Texas high court explained that "[it] relied on the fact that companies take extensive precautions to

protect intellectual property." *Id.* (Which, notably, is *exactly* what Plaintiffs allege it did here.[20]) From that common-sense inference, the Texas Supreme Court explained that, in a "world of high employee mobility in which information flows easily, it is not unexpected for employees to go work for a competitor and take trade secrets with them," stressing that companies in the "software industry" should thus be "suspicious" whenever an employee joins a competitor. *Id.* (citing *Altai.*, 918 S.W.2d at 456–57 (Tex. 1996) ("[T]he reality [is] that, in most cases, trade secret misappropriation generally is capable of detection within the time allotted for bringing such suits"). The principles from *Wagner* and *Altai* apply with full force here—especially given Plaintiffs allege Stauber refused to return hard-drives containing the very trade secrets Plaintiffs now claim were misappropriated *after* providing notice he would be leaving to join a competitor.

Accordingly, Plaintiffs' Amended Complaint should be dismissed with prejudice because, under their own allegations, their claims went stale well before they filed this lawsuit. A second amendment, at this juncture, would be futile.

## V.   CONCLUSION

For the reasons discussed above, the Amended Complaint should be dismissed for forum non-conveniens or, as against the Israeli Defendants, lack of personal jurisdiction. Should the Court reach the merits of the Amended Complaint, however, it should be dismissed in its entirety under the applicable statutes of limitations.

---

[20] Plaintiffs tout their purportedly "best-in class practices and policies to safeguard its trade secrets and the knowledge of how its trade secrets were developed." Am. Compl. ¶ 79. To that end, Plaintiffs allege their "safeguards primarily consist of three layers: (1) internal cybersecurity policies and practices; (2) physical barriers; and (3) legal protections." *Id*. Plaintiffs detail each layer in the Amended Complaint. *See id*. ¶¶ 80–91.

Respectfully Submitted,

**HOLLAND & KNIGHT LLP**

/s/ *L. Bradley Hancock*
L. Bradley Hancock
811 Main Street, Suite 2500
Houston, Texas 77002
**Telephone:**  713.821.7000
**Facsimile:**  713.821.7001

Mark C. Davis
mark.davis@hklaw.com
98 San Jacinto Blvd., Suite 1900
Austin, Texas 78707
Telephone: 512.472.1081
Facsimile:  512.472.7473

Robert S. Hill
robert.hill@hklaw.com
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.964.9500
Facsimile:  214.964.9501

Anthony J. Sirven – *admitted pro hac vice*
anthony.sirven@hklaw.com
Gabriel Godoy – *seeking pro hac vice*
gabriel.godoy-dalmau@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: 305.374.8500
Facsimile:  305.789.7799

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing instrument was served on all participating parties this 3rd day of May, 2023, via the Court's filing system.

/s/ *L. Bradley Hancock*
L. Bradley Hancock

31